### BERRY v. FUEL ECONOMY ENGINEERING CO. et al.

#### (District Court, E. D. Pennsylvania. January 29, 1918.)

#### No. 1531.

PATENTS ⬡⟝328—VALIDITY AND INFRINGEMENT—FEED WATER REGULATOR.

The Berry patent, No. 726,792, for a feed water regulator for steam boilers, discloses patentable novelty and invention, covering a device by which is secured the highest efficiency of the supply regulator by reason of its delicacy of mechanism, and which at the same time is readily removable for cleaning and repair. In this limited field the patentee was a pioneer, and the patent is not limited to a particular structure, but is entitled to a liberal construction. As so contrued, *held* infringed.

In Equity. Suit by William H. Berry against the Fuel Economy Engineering Company, John J. Buckley, and J. F. MacIndoe. On final hearing. Decree for complainant.

John E. McDonough, of Chester, Pa., and Augustus B. Stoughton, of Philadelphia, Pa., for plaintiff.
Robert M. Barr, of Philadelphia, Pa., for defendants.

⬡⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DICKINSON, District Judge. The question involved in this case, in the sense of what is really in controversy, is presented in contrasting statements of the respective positions of the parties.

The patent with which we are concerned is that granted to the plaintiff as No. 726,792, relating to steam boilers, and granted for an improvement to feed water regulators. It is asserted, on behalf of the plaintiff, that he made a real and valuable contribution to the art, through and by an invention combining the features of such delicacy of mechanism as to be quickly responsive to the demands made upon it and, at the same time, to be removable for adjustment and repair without interference with working conditions.

The claims of the patent are given a reading sufficiently broad to visit a charge of infringement upon the defendants. It is asserted, on behalf of the latter, that such reading of the claims is an afterthought, no suggestion of which is to be found in the application, or its claims, and is prompted by a desire to forbid the use of defendants' device, and to appropriate the trade which it would otherwise command.

Defendants' real position is taken, not so much on a denial (although this is also formally made) that the invention of the plaintiff was broad enough to have included all which is now claimed, but on the assertion that no patent was asked for or granted covering that part of the invention which is embodied in defendants' device, and that defendants in consequence had the right to appropriate all of the invention of which they have made use. Stated in other terms, the plaintiff disclaimed or dedicated to the public that part of his invention, the thought of which may be expressed by the word "genus," and limited the claims of his patent to a species, of which genus defendants' device is another distinct species, not otherwise akin to that of the plaintiff. There is, in consequence, no infringement.

The bill, as originally framed, embraced other complaints than that of the infringement of the patent. These other causes of action involved nothing arising out of either the Constitution or laws of the United States, and as the plaintiff and some of the defendants are citizens of the same state, a question of jurisdiction was suggested, which it was finally stipulated should be avoided by the plaintiff reframing his bill into one involving only a dispute arising out of rights claimed by him under his letters patent.

The relation between the plaintiff and some of the defendants was so well known and appreciated by all concerned in the trial that a very full statement of the general facts out of which this controversy has arisen was not put upon the record. It is, however, sufficiently disclosed to one familiar with the general conditions, the atmosphere of which pervades the case.

This general situation is that the plaintiff is himself a trained, practical mechanic of many years' standing. To the knowledge gained by his experience in positions which he had occupied as master mechanic he has added the fruits of a very practical training as a mechanical engineer, in addition to which he has been an inventor in the wide field covered by his activities. He has also been engaged in the pro-

248 F.—47

fession of mechanical engineering and the business of a machinist, in the course of which he built and dealt in the device covered by this patent. In the conduct of this business he had the assistance of two of the defendants, who became familiar with all the devices made by the plaintiff and came to know the plaintiff's customers. These defendants severed their business relations with the plaintiff, and left his employ to enter that of the other defendant. The plaintiff's real complaint is that his former employés took with them the plaintiff's device, bestowing it upon their new employer, who afterwards, with them, built the same device in a slightly modified form, varied only by slight mechanical differences, and have been since selling it to the trade, including that part of it which the plaintiff naturally thought to be his own. As all features of the complaint other than the patent have been eliminated, of these other features, the truth of the complaint of which is denied, we know nothing, and now care nothing, except so far as they may bear upon the fact of infringement.

We are therefore required to confine ourselves wholly to that part of the controversy which concerns the plaintiff's claim of proprietary rights under his letters patent. There is no dispute, as there would be expected to be none, over the utility feature of this claimed patented device. This is because, whatever else may be said of these rival devices, they make the same appeal to the approval of customers and other users. Neither, under such circumstances, can deny merit to the device of the other, without to that extent condemning his own. The utility of plaintiff's device is, moreover, not only established by the testimony of the expert witnesses, but by the recognition given it in the ready sale which it commanded, and a clear tribute is paid to the merits of the defendants' device, not only by the asserted similitude between the two devices, but also by the complaint which the plaintiff made that the defendants were unduly sharing in the trade.

The device of the defendants is likewise put out under at least the cloak of the protection of letters patent No. 1,170,044, granted February 1, 1916, to one of the defendants. Each of the parties, therefore, has what in this sense may be termed the prima facie exclusive right to his device, although many things in the course of the trial carry the implication that the plaintiff does not admit possession of any such right to be in any of the defendants. With this controversy again we have nothing to do.

The plaintiff in effect charges the defendants with the bold attempt to appropriate his make of device, copy it almost exactly, and sell it as their own in place of his. As before indicated, we are not now concerned with that part of the charge which indicts them with the offense of imposing their make of device upon his customers as his make of device, but we are only concerned with such part of the charge as asserts a violation of the rights granted to him by his patent.

There is, of course, no claim that the patentee is a pioneer in the broad field of boiler construction; but there is an earnest and aggressive claim that he is a pioneer in the small field which he marked out for himself within the limits of this broad field. In order to under-

stand the problem upon which the plaintiff claims to have successfully brought his inventive faculties to bear, a few general observations may be of aid.

The modern engineering practice has brought out the thought of the value of what may be termed the permanence of water level in boilers, or, as more accurately phrased, the maintenance of this water level. This is maintained through and by the device of a water column, in which is a float which responds to the water level in the boiler, and at given levels automatically operates the water supply through and by means of a mechanism which actuates valves controlling the supply, and which itself responds to the commands of the float. This water column is, of course, in a sense a distinct and separate body of water from that in the boiler; but in the Philadelphia district it is required, and there is among engineers a universal recognition everywhere of the necessity, or at least the wisdom, of keeping the boiler water body integral with the water column body, and because of this the absence of valve connections in the communication between them. It is recognized, further, to be of importance that a small change in the water level in the boiler should be communicated to the water column and should cause the supply regulator to operate.

There are two ways of accomplishing this. One is to have a large float, which will operate the mechanism required to be operated by exerting sufficient power to overcome any friction there may be. Another is by having as nearly as possible a frictionless mechanism, requiring small power to operate it, and thereby permitting of the use of a small float. This delicacy of mechanism is in itself desirable; but, if delicate, the mechanism is easily upset. The conditions made the danger of this disarrangement of the mechanism a real danger. It is sufficient to instance the one of a clogging due to impurities in the water supply. This fact introduces the requirement of some means of access to this mechanism, in order that it may be removed for cleansing or repair. If the point of disconnection is within reach of the steam, it is clear that the removal of the parts is impossible, or at least impracticable, because of the danger involved, unless the steam is shut off. This would interrupt operations.

Out of these facts sprang the necessity of in some way shutting the steam off from the place from which this mechanism was removed. The prior art had sought to meet the conditions of this problem by the use of stuffing boxes. This fulfilled the purpose intended, but it was at the cost of such an increase of friction as to bring about a decrease in efficiency of the regulating construction. That this cost was excessive is indicated by the fact that there might be a very considerable change in the water level in the boiler before the supply regulator would operate. The prior art had sought to eliminate this frictional excess, and successfully so through and by the use of a mechanism, such as is illustrated in the Walter patent; but this, again, was at the cost of rendering this mechanism inaccessible for the purposes of removal or repair, while, at the same time, through its increased delicacy of construction, rendering the mechanism more liable to disturbance, and thereby making the necessity of access to it of more frequent recurrence.

The problem which confronted Berry as an inventor was to preserve this delicacy of mechanism, in order that thereby he might secure the highest efficiency of the supply regulator and at the same time so contrive as that the mechanism might be readily and easily removed. This problem he solved, and in this limited field he was a pioneer.

Without attempting a description of the details of construction in his device, the essential thought was to have the shut-off, which prevented the egress of the steam when the mechanism was removed, held normally out of operation and at the same time to be always striving to get into operation, and being permitted to do so by the very first act toward the removal of the mechanism, so that the first turning movement toward removing the mechanism would simultaneously bring the shut-off into operation. This was accomplished by the expedient of having a valve kept pressed away from its seat by a plug, whose contact with the valve could be controlled from the outside, so that, as the plug was withdrawn, the valve would be caused, by the pressure of the steam back of it, to follow until the valve became seated, when the operation of removal could be completed without danger of the escape of steam.

Just here may be brought to bear the point before made on which the whole defense pivots. The argument made on behalf of the defendants does not deny novelty in the idea which we have attempted to convey, nor does it imply a denial that the patentee might have claimed invention in any device embodying this idea. The stress of the argument is upon the finding which we are asked to make that, however broad the patentee might have made his claims, he limited himself to a claim to the specific construction by which the result sought to be attained was reached.

We are unable to construe the claims as narrowly as we are asked to do. As patents are issued to evidence the exclusive right of the patentee to make, use, or vend things, it is necessary that patent claims should cover the embodiment of ideas, and not the application of abstract ideas to disembodied conceptions. In this sense patent claims refer to constructed things, or to things conceived of as being constructed, and not to the abstract idea in accordance with which they are constructed. The limitations of human language and of the space required for the written expression of ideas are such that it is impossible to cover within the requirement of the patent laws every possible variation in the embodiment of the same inventive idea.

The phrase "substantially as described," which is parroted at the end of every patent claim, was devised to eke out this poverty of language. After all, what is done is to view the infringement construction in the light of the prior state of the art, and of the advance which the patentee of the infringed patent made, and pronounce judgment according to the encroachment or nonencroachment by the alleged infringer upon the field of construction which the patentee has marked for his own.

In this sense, as is the situation in the instant case, when we have determined the limits of this field, we have determined both the scope of the claims and the infringement. Each and every of the tests usually applied to determine the questions of invention and of infringement

result here in a finding in favor of the plaintiff. In the first place, the history of the art brings into view no one before this patentee who had solved the problem of frictionless parts and their removability, in the sense in which the latter term is properly to be interpreted. Those who before him had attempted to solve the problem may be divided into two classes, the members of which had each solved, respectively, one-half of the problem. We had, on the one hand, stuffing boxes, by which one of the ends desired to be reached could be reached; but it was at the expense of destroying the delicacy, and, to this extent, the efficiency, of the regulating mechanism. The other had mechanisms which were practically ideal in the presentation of the features of delicacy and efficiency when in operating condition, but which could not be readily restored to operative efficiency, and this condition of inoperativeness was hastened by their very delicacy. Before Berry we had no device which covered both requirements of the problem. This part of the field of possible discovery his invention covered, and as his reward he should be protected in his exclusive occupancy of it during the time limited by the patent laws. The construction thus given to the claims renders unnecessary any comparison of the two devices, for the reason that the very clear-cut argument of counsel for defendants virtually concedes the fact of infringement, if this broad meaning be given to the claims.

A few additional general observations will help to clarify the thought with which the trial court was impressed. The plaintiff is claiming a monopoly of the right to make devices, of which that of the defendants is one. This monopoly, of course, he cannot protect through the decree of a court, unless it is his right. He can assert such right only as it is evidenced by letters patent. It is not enough that the device was his invention. He must have patented it, and his rights are measured by his grant. If he invented something which he did not patent, his disclosure is a dedication to the public, and confers the right of use upon every one. The truth of this proposition is supported by obvious principles of law, and is confirmed by any number of rulings, of which it is sufficient to refer to Motion Pictures Patents Case, 200 Fed. 412, 118 C. C. A. 563.

The real finding asked to be made is that of a disclaimer by the applicant for the patent. The real question is whether such disclaimer can be found. The answer must be sought in the whole situation presented. If we restrict ourselves to the verbiage of this application, the impression received is that the applicant was asking for a patent limited to a particular structure. This impression is not wholly removed by a further resort to the words of the claims, although they are broader than the expressions in the application, and may be read, as we find they should be read, broadly enough to include defendants' device. None the less, it must be admitted, the claims may be read as including only a particular construction. When there is at least this possible difference of reading, the real question is reduced to that of what should be the inclination of the reader. When the meaning of words is in question, the situation and character of the writer or speaker becomes of value in determining the sense to be given to the

words employed. The words here are the words of one who is primarily a mechanic. He is speaking, it is true, as an inventor; but, as the invention is embodied in a mechanical construction, it is to be expected that one whose mind was dominated by his mechanical training and experience, one whose mind had the mechanical bent, would express himself in mechanical terms. If, however, the thought is present and is found to have been expressed—in other words, if the invention is disclosed by the application and covered by the claims—the terms in which the thought is thus expressed become unimportant.

To illustrate the point attempted to be made, we compare two applications and pronounce the same judgment as to each. One employs the words of an inventor, who is not a mechanic, but a man trained to the expression of abstract ideas. The application as framed by him might take the form of a claim to the conception of an invention (describing it) which is embodied in a mechanical construction (also described). The other employs the words of a man trained as a mechanic, who gets his grasp of the principles of an operation from seeing them embodied in a concrete construction. The application as framed by the latter might take the form of a description of the embodied construction. In this he would see the invention as clearly as if it were placarded. The mental processes are different, but the thought result is the same. The type of man first described would have difficulty in firmly grasping the inventive idea, unless you gave it to him first in its abstract form and then embodied it in its concrete form. If he was confronted with the latter only, the thought of the principle of the construction might find no entrance to his mind. The mechanically minded type of man would see the principles of construction sticking out of every part of the construction. If this application and the claims are read with this thought in mind, the inventive idea, now claimed to be there expressed, clearly appears.

There is this further observation to be made. If there is no thought of the invention, to which claim is now made, to be found in the claims of plaintiff's patent, then there is no invention for which a patent could issue, except possibly one for a particular construction, which would be of such small value as not to be worth the office fees payable on its issue. We say this because, given the inventive thought hereinbefore referred to, its embodiment in a construction called for very little, if anything, more than the application of mechanical judgment and skill. Every means employed in each of these devices to make use of the inventive idea involved is as old as almost anything in mechanics. The plaintiff must therefore be given that which he claims, or denied everything of any real value.

There is only one more thing to be said. The very able presentation of the defense with which we have been favored, if driven from its main position, has in reserve the falling back to a secondary position. This is in substance that defendants' device does not infringe, because it does not embody the invention claimed by the plaintiff. Some confirmation is given to this thought by the fact that defendants' device is also patented. The averment of no infringement is based upon this difference in construction. The plaintiff's device is so con-

structed that the mechanism to be removed cannot be removed without shutting off egress of steam. In this respect it possesses a "fool-proof" feature. The defendants' device is not so constructed. On the contrary, the work of removal involves starting it at one place, and, before an opening had been made for the escape of steam, a manually operated stop valve is brought into use, and the work of removal is then resumed. If this stop valve is not used, the escape of steam is not prevented. In other words, the difference is that in the Berry device the steam is shut off as a consequence of starting the work of removal, and it is in this sense automatic, while in the defendants' device there must be a second manual operation or manipulation before the steam is shut off.

This difference, however, cannot afford escape from the charge of infringement. It does make clear, however, that the validity of each patent may be upheld. Given the right in Berry to the invention claimed, the defendants cannot use it by varying the means of using it, even if the second means has less merit than the first. The fact, however, that the second device differs from the first, might well give the second patentee a valid patent on his improved device, which would, however, be secondary and subordinated to the first patent. The "fool-proof" feature would have little practical value, because the work of removal is always in practice done by experienced men, and they would understand the work of removal was to be done so it could safely be done. When it is so done, what is done is done as the Berry device does it of itself.

Without further prolonging the discussion, we find the claims in issue, 5, 10, 11, and 12, to be valid, and to have been infringed by the defendants.

A decree embodying these findings, and according costs to the plaintiff, may be submitted.